Good morning. May it please the court. Tom Miller on behalf of Appellants Christopher Myers and Ryan Beecroft, two Seattle police officers. This is an appeal of the, it's an interlocutory appeal of the district court's denial of qualified immunity to Officer Myers and Officer Bancroft, who are two Seattle police officers that were, had to use deadly force to defend their own lives and the lives of their fellow officers from a domestic violence suspect who had just threatened his live-in girlfriend with a knife. She was in the bathroom, called 911. Officers responded. When they arrived, they announced themselves as Seattle police, kicked the door, obviously alerting Mr. Smith, who was the subject of their presence. He refused to open the door. The officers then breached the door to make an exigent entry, and upon doing so were greeted with Mr. Smith just 7 to 10 feet away, holding a knife down at his waist in his right hand, and they gave him commands to drop the knife. He didn't drop the knife. He advanced on the officers, got to within 4 1⁄2 feet of Officer Myers and 5 1⁄2 feet of Officer Beecroft, at which point the officers fired their weapons. Did the officers at any time say, or we will shoot? No, they did not. And how long elapsed between the time the door is down and the shooting? Six seconds. And how many movements was Mr. Smith making during that time? He took approximately three steps towards the officers. I saw the video. I did not see three steps. My recollection from looking at the video was at least two, and I think the third took him to the threshold, at which point the officers fired their weapons. As I saw it, he stood there and then made kind of a half step forward. I did not see three steps. I did not see two. Well, the video, I guess, speaks for itself. And regardless, he covered, and we put it in our opening brief, a number of feet he advanced towards the officers. The officers retreated back to the extent they could. But that gets into the question of how far is it reasonable to retreat when you've got a victim, a domestic violence victim, who the officers under RCW 1099 are instructed specifically that that is the highest priority above the officer's safety and above the subject's safety. Katie Nolan, who was the victim in the bathroom. But as far as they know, the information they have, she is locked in the bathroom. She was able to protect herself by locking herself in the bathroom. So as far as they know, when they shoot Mr. Smith, she's locked in the bathroom. They didn't hear locked in the bathroom. The dispatch was that she had an object in front of the door, and that's from the CAD in the dispatch. And that is a distinction. I mean, Officer Beecroft had been in the apartment and knew that those doors are easily breached. Just because someone has a door locked doesn't mean somebody can't get at them. Mr. Miller, did they have any duty to inquire of dispatch? There are several allegations that there's some confusion around the facts in the apartment. Did they have any responsibility to try to clarify about the blood, the state of the victim, whether it was locked, any of the situations they were approaching? They didn't. And the reason why is twofold. One, this is a very high-urgency situation. These are some of the most dangerous calls for the victims and for the officers. They needed to get in. Time was of the essence. The second is that they all testified in their depositions unequivocally. The blood and where it may have been located, whether it was inside the bathroom, outside the bathroom, whether it was hers, whether it was his, that didn't matter. The core facts that mattered were you've got a domestic violence victim trapped in a house with a gentleman who is threatening to kill her with a knife. That is the highest calling of our law enforcement officers is to go and protect those helpless people, and that's what they were doing. So the notion that they need to pull back and say, wait a minute, can you tell me if the blood is outside the bathroom or inside? As I understand it, Officer Myers arrived at the scene sometime before the other officers arrived there. And were there any inquiries then to try to clarify the situation and make a plan about how much time was Officer Myers outside of the scene before backup came? Seconds. It was not long. And you see in the body worn as they approach. I mean, he's up there first and then Beecroft and then Knight and Moyo, who are the third and fourth officers, are behind them. If I understand it, after they kick down the door and they see him, they shout a whole variety of different orders that are not consistent with one another, which, you know, at a minimum, even a person much more intelligent than he apparently was would have had difficulty understanding what to do. They say, put up your hands. Then they say, let me see your hands. Then they say, get on the fucking ground. Then they say, drop the knife. I mean, why wouldn't someone in his situation be totally confused by all that? Because those are simple commands that are easy to comply with. And they're all consistent, largely. Drop the knife, get on the ground. They have them at gunpoint at that point in time. Put your hands up is the first one, I believe. That's correct. Put your hands up, and then you're supposed to get down on the ground and drop the knife more or less simultaneously? Frankly, at that point in time, it doesn't matter what he does first. He wasn't complying with any of those commands. Rather than get on the ground, he advanced. I'm asking you because I think, and by the way, what's the standard we have to apply here? Do we have to take, for purposes of this motion, everything most favorably to your adversary? Absolutely.  So at that point, why, when he be a reasonable person in his position, let alone a person under the mental problems that he had, not really know what to do? Well, what is going through his mind is not our standard that we're looking at. We're looking at what would an objectively reasonable officer in a position of opposite mind?  Well, and why wouldn't an objectively reasonable officer be aware that he and his colleagues are shouting inconsistent demands at him? Because all of those commands get at the same thing. Stop what you're doing, drop the knife. Show your hands and drop down the floor and drop the knife. Why are those consistent? You can do each of them at the same time. You can show your hands, drop the knife, and get down. I just did it, and it's that simple. And a reasonable officer with a gentleman holding a knife...  We won't need to arrest you then in this case. Well, Mr. Miller, of course, this is all with the benefit of a transcript, I think, on first listen, and that's all the listening that the decedent had to do. It's quite muddled. What are we supposed to make out of that? In some of our cases, it suggests, well, it'd be better to warn. There was no actual warning. The question of compliance, to the extent this comes down to, compliance with what? The decedent didn't have the transcript to parse all of these different things that are being yelled at him. And nor did the officers. This is literally split-second decision-making that's contemplated by Graham v. Conner, being played out in real time in a matter of six seconds. And so my response to that is, what is reasonable for them? It's reasonable for them to conclude, he knows not to do what he's doing, and yet he's continuing to do it anyway. I don't have time to wait and see what he's going to do next. I need to use force to defend myself. Well, there seemed to be some contemplation before breaking down the door, your understanding that he was right behind it, of who was on point, shall we say, who was in lead, who was going to kick down the door. Why wouldn't it be reasonable, then, to expect that to continue in terms of communications with the suspect, so that one person would be the voice of law enforcement and be giving the instructions rather than two or three? Well, I think that's all well and good, standing here in a courtroom, real time, as this thing is playing out, Officer Beecroft and Officer Myers are both seeing this gentleman not comply with their orders. They're doing what comes naturally to police officers in that situation, give him orders. When they shot him, as I see the video, the hallway goes like this, they're in the hallway, the door is here, he's just inside the apartment, he has not yet crossed the threshold, although he's basically right at the threshold. Am I describing that properly? So he has not turned the corner and come out into the hallway. He's still in the apartment. They are in the hallway, which is at right angles to him. Correct. I'm trying to figure out, was it reasonable for them, when what he has is a knife, he does not have a gun, he needs to get to them before they will be hurt. Is it reasonable for them, in that situation, to shoot after six seconds without warning, if you don't drop it, we're going to shoot you? Yes, and I would submit, and I'd like to reserve, we'll say four minutes of my time. I forgot to do that at the outset. A subject with a knife at six feet is arguably more dangerous than a subject with a gun at that distance. They can close that distance in a split second and inflict a mortal or a very serious wound on an officer in the blink of an eye. So the notion that it's just a knife, the law doesn't recognize that, and the litany of cases cited in our moving brief and in our reply brief, I mean the Hart case, which just came down in February, just reiterates the point that... I think you're describing accurately both the situation with someone with a knife and our case law, but I looked at the video. He's at right angles to them. He's still inside the apartment. He is, if moving, moving very slowly, and we're only doing six seconds. They were awful quick to shoot that man. Well, and they had to be, because they couldn't wait for him to keep aggressing and make the fatal move towards them, and likewise, they couldn't just retreat down the hall. You say aggressing. That's a pretty strong word. I saw him moving slowly. Well, he's moving slowly, but he also started with the knife at his waist, and he brought it up into this position here, which tells an objectively reasonable officer, I'm not going to comply with you, and, in fact, I'm going to do something that's more aggressive than continuing to hold the knife. I'm going to bring it up into an offensive position. Mr. Mill, and we can give you some additional time for our questions. I think you make something of the fact that the district court relied primarily or exclusively on an unpublished memorandum disposition of our court. Does that matter for us on de novo review? In other words, are we prohibited from considering the qualified immunity question and whether law is clearly established by reference to other cases? No, you're not. Obviously, this is a de novo review of that question. However, it underscores this was done in a minute order by the district court judge. It wasn't even a full briefed order. And he cited three disputed issues of fact kind of offhand without a cite to the record. Mental health crisis, the conflicting commands, and that the knife wasn't pointed or aimed at anyone. And as I pointed out in our moving brief, there's no legal requisite that the knife be pointed at you in order for the deadly force to be reasonable in that situation. But it can certainly be a de novo review. But my point is to say that the law was clearly established. These officers, that they should know in that six seconds that you cannot, that every other reasonable officer would know it is unconstitutional to use deadly force in this scenario to protect yourself. And the only case that he cites for that proposition is an unpublished decision that is factually distinct where the subject is holding an exacto knife, cringing and fearful and moving away from officers rather than in this situation bringing the knife up and moving towards the officers. Those are two very different scenarios. Okay, and listen, I'm not even asking you to answer the question. I'm just saying that we have a terribly tangled case law on the appealability of interlocutory orders here, and I have no idea whether we have interlocutory appellate jurisdiction. I would suggest that you do for just what I pointed out, which is Judge Zille pointed out the fact that Mr. Smith was in a mental health crisis. Well, we know from our case law most recently in Hart v. Redwood that the Ninth Circuit does not establish two tracks, one for mental health, one for other uses of force. So that is not a material fact. The other fact that the judge pointed out was that the knife wasn't pointed or aimed. Again, that is not a material fact. And the third piece that he pointed out were the commands. And again, to a reasonable officer in these officers' position with just split seconds to react to this situation, the notion that it is conflicting to say, show your hands, drop the knife, get on the ground, I would submit, is not a material fact. What matters is what they're objectively perceiving, him not doing any of those things. Thank you. Thank you, Mr. Miller. We'll give you a couple minutes on rebuttal. I appreciate it. Thank you. I'm sorry, I had one last question.  I apologize. Is it your position that if he did not drop the knife but took no step towards them, in other words, he just stood there, but having been ordered to drop the knife, he did not drop the knife, that would warrant shooting him? Classic lawyer answer, it would depend. That's not the situation that they were confronted with, but it would depend. That's a wonderful thing. That's what a probably expert witness would say. It depends on the circumstances. And it truly does because the officers would then need to reevaluate and see what they're dealing with now, and it could. It could very well be reasonable. I mean, look at Blanford. That was a situation where the subject, he's not even going towards the officers. He's walking into a household that they don't even know if it has any people away from the officers, and they shot him, and the court ruled that it was reasonable because there could have been people in that house, and the officers needed to protect them. Same thing with Hart, 17 feet away, and one officer attempted a taser simultaneously. Simultaneously, the other officer deployed deadly force, and the court ruled that was reasonable due to the distance and the lack of compliance with the commands. Thank you, Mr. Hanley. Thank you. Mr. Sullivan. Good morning, Your Honor. May it please the Court, Brian Sullivan on behalf of the plaintiff, Apelli Rose Johnson. I'm here with my co-counsel, Joe Moore. I'm Joe Rome. The court should rule in Ms. Johnson's favor for two reasons, and the first, Your Honor, addressed is the jurisdictional question. This is really about disputed facts. How he's holding the knife, whether he's pointing the knife at the officers, whether he's starting to comply with commands. The appellants take factual issue with each of them in an order, little descriptions in some little way that he's aggressing on the officers. When he's moving maybe a shuffle step or two, maybe a mile an hour, and maybe at the point where he's shuffling, is he even really aggressing on them? But they're taking these as factual disputes, and that's the jurisdictional issue. And so I think as a first question, these aren't purely legal issues. It's a question of fact about whether Ryan was an immediate threat in this moment. As he's within the threshold of his door, he slumps down and dies inside his apartment. He never comes close. He never gets in. The closest he gets is the beat-in part of the threshold door. He doesn't even make it to the actual threshold. What are we supposed to make of the – how do we analyze the fact that the victim is right on the other side of the door as well? Absolutely. It's conveyed to the officers that she's barricaded in the room. She is not injured. She is calling for help, and while the officers don't know that, that gets to this underlying – there's negligence claims also that aren't part of the appeal. But she's not in an immediate threat, and our expert I think does a good job describing this difference between there's a threat and officers are faced with threats every day. Most police cars say things like reminding them to not speed because there's no speed of getting somewhere that's worth ruining your safety. They're in constant threats all the time. The question is an immediate threat or imminent harm. And she's not in imminent harm because that door is shut and it's barricaded, and they're not in imminent harm because he's around the corner and they've got four Glocks trained on him. And so where should we look in our published cases that would clearly establish the unconstitutionality of this? Yeah. The Harris case, the law enforcement officers may not kill suspects that don't pose an immediate threat. Well, but the Supreme Court has already warned us against reading that too broadly.  I think the George case and then I think the Hart case that they cite also are both really great cases for the plaintiff appellee here. When we—the question of the immediate threat, this is someone with a long gun, and it's unclear if it's an immediate threat until he raises it up at the officers. So that's the George case, right? That's a real threat. Well, why wouldn't—I suspect the counterargument is that the person here is raising the knife up. Sure, and that's a question of fact though, right? Because we've got somebody telling him to put his hands above his head, to drop his knife, to get on the ground all at the same time. They say that he's doing it in an aggressive way. It could be in a self-harm way. It could be in an attempt to follow the convoluted orders. It gets to a little bit of a question of fact there about raising the knife. That's really very much like the George case. And they cite the Hart case also. Hart traveled 30 feet in, like, less than six seconds with a knife pointed out at them, running at them essentially. He's going four-plus miles an hour by my calculations. That's pretty—that's running. Maybe not a full-on sprint, but that's someone coming at you to knife you in an attack stance. That's not somebody who starts to pull a knife up this way after they take a couple stagger steps, shuffles. What do we do with the Casella case? So that's the case where the Supreme Court, I believe, overturned our court, in a case where the person was at quite some distance. You had a purported victim, turned out not to be, on the other side of a fence. Yeah. I think it comes back ultimately to the question of fact of what's going on here and the subtle questions of fact that the officers are in a situation where the person's around the corner, the person is known to be barricaded in a room. There is nothing suggesting in this particular case that he is about to harm these other people. You know, our case law—and you're getting into it. I mean, we have a lot of cases of police shootings. Some of them published, some of them indisposed. And I think this is probably an accurate description. They're all over the lot. So if they're all over the lot, how do we get to the qualified immunity decision here, which is to say there's got to be some clarity. They're instructing the officers so that they're violating some clear command of the law. In this case, I think we have to look at the whole thing that happened with these officers as they are aggressing and pushing this incident. The opposing counsel says that they had to move this fast. They had to do it this fast. But that's not what the record underlying shows. It shows that they slowed down on the way to the scene to try to link up to get there. But the first officer that got there waited. About how much time? How would you describe the amount of time there? Overall, it's probably more than a minute, and perhaps more because of the slowing down on the way there as well. When we factor that in also, this isn't a rush to get to the scene as fast as we can. And then Myers doesn't wait. He doesn't form a plan. He doesn't talk. They've decided that they know the plan because of how they've communicated, but that's clear that they don't have a plan. By the time the door opens, there's no plan. How much additional time? So you have the victim on the other side of the door still on the phone with 911. Yes. Asking about. Right. So how much time, once they've mustered and they've all arrived at the scene, how much time should they have taken to plan? Five seconds. And what would that plan look like? I've got less lethal. You've got lethal. You're back up. You're arrest. Boom. And that's what it takes. That's what real officers do when they're planning in the heat of the moment. They do not talk. They do not do anything. They do what our military guys do. They make a quick, fast, hasty plan, and they get it done. And that's what they could have done here. Officer Myers. How would that have changed the situation? I mean, so they've got themselves assigned certain responsibilities. They break down the door. He's standing there. He makes a step or two forward at them. He's holding a knife. Well, so you've assigned one officer responsibility for shooting, if necessary. How would that plan have changed the outcome here? Absolutely. So this is much like HART, but now you have a master taser instructor whose lead on point with a taser, who from six feet away with a man without a shirt on, can, on the first step, can take that fire. And then there's less lethal alternatives that are being deployed. But when no officers decide they're going to go less lethal, no officers have their less lethal firearms out, they haven't planned it, they haven't thought about it, they didn't even get stuff that might have been in their trunk that could have helped the other officers have less lethal alternatives, and instead they just go for it, that's not reasonable. When you have all these tools in your tool belt to take a second and talk to your people about what you can do, in HART the taser misses, they shoot, it's okay. If that had really happened here, that would have been an okay response. Had the taser gone off, Ryan Smith doesn't go down, and they fire, and that all happens in a second, that's fine. That's reasonable under the circumstances. But what's not reasonable is the conflicting commands, not somebody aggressing at the police, and then being shot without the consideration, really, of less lethal alternatives. An officer of mine is saying for a split second, I thought about going to my taser but didn't have time. That's flawed because it's unreasonable that I have planned for just a few seconds. That five seconds I said. And what's your case that clearly establishes a duty to plan? It's the reasonableness. It's the reasonableness and it's the... But I think, you know, the Supreme Court reversing us focuses one's mind on these questions. And so they've instructed us, I think Graham itself instructs us, so we don't deal with it at that wholesale level.  It's the immediate threat to the officers, and officers acting reasonably in that moment, one of them would have had a taser drawn and it wouldn't have been an immediate threat that they would have had to use deadly force for. Do we have a case that isolates that requirement? It's clearly established that in these similar circumstances, nonlethal force must be used first. I don't think... No, I don't think necessarily nonlethal use force. I think it's... If we don't look at it from literally the split second where he's going to shoot but we give that any backup time at all, that's... I think that's the underlying issue. They have to consider things, though, like it is a mental health crisis. It is somebody who's... Well, it's a tough situation for the officers, no doubt, going into it. But a reasonable officer, I think, would have taken the moment to give either clear commands, or you're going to either give clear commands because you've talked. It's not that you have to necessarily talk, but if you don't talk, you have to do things in a way that's reasonable. So it's not that you don't have to plan beforehand. There's no requirement that you plan, but if you don't plan, you still have to be reasonable about it. So I just want to make sure, because I haven't, forgive me, yet watched the video. He's given these various orders. He doesn't do any of the things he's ordered to do. He doesn't drop to the ground. He doesn't drop the knife. He doesn't put his hands in the air. But what he does do is take the hand that is holding the knife that has been down lower and raise it up. If that's what happens, why isn't that a suggestion to a reasonable police officer that he's about to attack us? Absolutely. I think the way that you raised up your hand and the way that Mr. Miller raised his hand in his argument is the exact issue. That's a question of fact, because that's not how it really happens in the video. It's slower. It's up more towards the side. It's not out and aggressive, and I think that's what the district court, when they said he's not waving the knife, he's not pointing the knife. This is much more like a firearm that's down at the ready and maybe moves, but it's not a furtive movement. It's not a sudden movement. It's not done with any kind of threatening language that's going along with it. It's relatively innocuous at slow speed from around the corner, and it's the around the corner part also that I think is a factor here that, Your Honor, when you see the video, he's got to come out and around the corner while firearms are trained on him. Yeah, so he's got to come out the door. He then has to turn into the hallway 90 degrees. Correct, and that's the immediate threat that we just don't have yet. Thank you. I'm happy to answer the court's other questions. Those are really the primary issues that I think we're here on. I'm happy to answer further questions. Thank you, Mr. Sullivan. Thank you very much, Your Honors. Mr. Miller. Thank you. I appreciate the extra time. The court had a lot of questions for Mr. Sullivan about where is the case law that clearly establishes that the officer's conduct here was objectively unreasonable. There is none, is the simple answer, and we pointed out in our reply brief. They cited, I mean, the Glenn case is Ruby Ridge, right, shooting a kid who's running back towards his mom after his dad's been killed. I think that's the Harris case. Sorry, that was Harris. Glenn was the young man outside of his parents' house. Who's going back into the house, yeah. None of those cases establish that these officers could not use deadly force to protect themselves from this threat. And the notion that it wasn't an immediate threat because he's behind some imaginary line of the threshold is just simply false. And if you look at the video, you'll see that. And you also have to bear in mind that just because he's behind the threshold doesn't mean he can't turn the corner and be on the officers who are just four and a half feet away and five and a half feet away from him before they can even raise their guns. Well, no, the guns are already raised. Right, but it's that quick that you cannot say that every reasonable officer would know, oh, we're safe because he's behind the invisible line of this threshold. That's not, and there's no case that says that more importantly. Why wasn't there an opportunity to retreat? Because then you're leaving the victim who you are sworn to protect. First and foremost, her safety matters. If they get too far. But in that scenario, he's moving away from the victim. For then, he's still right outside the bathroom door at that point. So if they just run down the hallway, they're giving him more time to do her harm. Immediacy of harm to the victim, to the woman in the bathroom, I don't see that as immediate, given that he's facing away from her, facing toward the officers, and your hypothetical is he continues to move away from her toward the officers. That does not sound like an immediate threat to her. Well, it's a consideration that's going through the officers' minds, bearing in mind Reed v. Hoy, which tells officers you do not have to retreat. That is not part of your job. If a person is coming at you with a knife, there's no Monty Python, simply run away. You need to hold your ground and to deal with the threat. And that's what these officers did. And what we're hearing is complete 20-20 hindsight. Coulda, woulda, shoulda. Some of those claims go to negligence, which is not before this court. What matters? And then, you know, Mendez v. LA tells this court that we cannot have the provocation rule anymore. And that's what those arguments get to, is a kind of provocation-type argument. You set the scene for this to happen. We're not looking at that here. We're looking at whether it's objectively reasonable to use force in this moment these officers used deadly force and whether it was clearly established that you couldn't. And I would submit that it was not clearly established, so this court should reverse and grant qualified immunity to Officers Myers and Beecroft. Thank you, Mr. Miller. Thank you very much. The case is submitted.
judges: FLETCHER, JOHNSTONE, Rakoff